IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Kisha Marie Davis, | ) | Civil Action No. 2:14-cv-03152-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| v. | ) | |
| | ) | |
| Medical University of South Carolina-Physicians, *MUSC-P*, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The Plaintiff, proceeding *pro se*, filed one employment action against Defendant on September 18, 2013, *see Davis v. MUSC-Physicians*, Civ. A. No. 2:13-cv-2544-WWD; she filed another on August 6, 2014, *see Davis v. MUSC-Physicians*, Civ. A. No. 2:14-cv-3152-MGB. (*See* Dkt. No. 1; Dkt. No. 32.) By Order dated November 4, 2014, the two actions were consolidated into the instant action, and the Court instructed that all future filings in this case should be filed in the case *sub judice*, *Davis v. MUSC-Physicians*, Civ. A. No. 2:14-cv-3152-MGB. (*See* Dkt. No. 30.) On February 11, 2015, upon consent of both parties, the instant action was referred to the undersigned for final disposition. (*See* Dkt. No. 65.) This matter is before the Court upon cross Motions for Summary Judgment. (*See* Dkt. No. 79; Dkt. No. 81.)

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment (Dkt. No. 79) is denied, and Defendant's Motion for Summary Judgment (Dkt. No. 81) is granted.

**ALLEGED FACTS**

Plaintiff, Kisha Marie Davis, alleges that while she was employed with the Defendant as "Division Leader, Pay Band 4," she "was qualified and applied for the position of Coder 1" in August or September of 2011. (Dkt. No. 32 at 3 of 5; Dkt. No. 1 at 4 of 12.) She alleges that she was a certified coder and that she had "been waiting for a surgical coder position, Pay Band 4, to become available." (Dkt. No. 32 at 3 of 5.)  According to Plaintiff, she was "contacted for a peer review

which consisted of 3 white coders, peers, non-management." (*Id.*)[1] Plaintiff alleges that when she "[w]ent downstairs for [her] appointment with the coders, [she] was met at the door by [a]pproximately 5-8 coders, all . . . looking at" her. (Dkt. No. 1 at 4 of 12.)  Plaintiff states,

> During this peer review, each peer had a copy of my application with all info to include my birth date, social security number, past salaries, information beyond that contained on a resume. After the peers questioned my abilities, they stated that they knew me, Sherry Blackwell & Shawn Whitney, but they wanted to <u>see</u> me. Prior to the peer review we had an ongoing electronic relationship. Very friendly. After they <u>saw</u> me, no more contacts were made. The relationship we had disappeared.

(Dkt. No. 32 at 3-4 of 5 (emphasis in original).) Plaintiff alleges that two of the members of the peer review team "stated that they just wanted to see [Plaintiff], and started making reference to how pretty [Plaintiff] was and how [Plaintiff] always look[ed] so nice." (Dkt. No. 1 at 4 of 12.) According to Plaintiff, as she was leaving, she "heard another voice asking, 'Is that her,'" and although Plaintiff "felt really awkward," she did not look back. (Dkt. No. 1 at 4 of 12.) Plaintiff alleges that approximately two weeks later, she "withdrew [her] application when [she] realized [she] was not going to be interviewed." (Dkt. No. 36-1 at 6 of 137.) Plaintiff states she withdrew her application because she "just couldn't stand to see that [she] was not selected for even an interview for a job [she] was well qualified to do." (Dkt. No. 1 at 5 of 12.) After this peer review process, Plaintiff alleges, "the coders no longer emailed [her] for assistance or help of any kind." (Dkt. No. 1 at 5 of 24.)

Plaintiff alleges that she later learned "that a younger, newly certified, white coder, [her] subordinate from under [her] leadership was offered the position," though this individual "was only certified for about 2 weeks prior to receiving the job offer." (Dkt. No. 32 at 4 of 5.) Plaintiff asserts that she never received an interview, even though the employee manual indicates that "internal candidates should receive an interview, and follow up as to why, or why not hired." (*Id.*) According

---

[1] Plaintiff alleges that these three individuals were Shawn Whitney, Sherry Blackwell, and Elizabeth Burton. (Dkt. No. 36-1 at 3 of 137; Dkt. No. 1 at 4 of 12.)

to Plaintiff, when she asked HR why she did not receive an interview, she was told, *inter alia*, "that Roper Hospital [was] hiring" and that because Plaintiff "withdrew [her] application after [her] subordinate accepted the job offer, HR . . . ha[d] no way of tracking and the departments can decide to process how they wish." (*Id.*) Plaintiff further alleges,

> I then asked what made my subordinate, newly credentialed coder, less qualified than me such an exceptional candidate rendering me unworthy of at least an interview. No answer was given. Brad Evans, HR director at that time promised he would get to the bottom of it. He resigned suddenly. No explanation was ever given as stated protocol indicates per the employee manual. I am a minority, black female over age 40.

(*Id.*) Plaintiff alleges she was "crushed" after the "review," and during the December 15, 2011 Christmas party, she "was snubbed and stared at by the coder depart[ment] (the white employees)." (Dkt. No. 36-1 at 125 of 137.) Plaintiff alleges she went to Nason Medical Center after the Christmas Party because she "thought [she] was having a stroke or heart attack." (*Id.*; *see also* Dkt. No. 36-1 at 127-37 of 137.)

In addition to her claim for age and race discrimination, Plaintiff alleges a claim for retaliation, a claim for disability discrimination, and a claim for interference with rights provided by the Family and Medical Leave Act. (*See* Dkt. No. 1-1 at 1-5 of 12.) Plaintiff alleges that in January or February of 2013, Defendant "hired a 50 year old, black lady (Arnetta Atkins)." (Dkt. No. 1 at 6 of 12.) Plaintiff alleges that on February 26, 2013, Ms. Atkins asked Plaintiff if she was interested in a position that Atkins "was trying to create as coding supervisor, but not a coding supervisor," where Plaintiff "would remain a division leader and . . . there [would] be more responsibility, but no additional money." (Dkt. No. 1 at 6 of 12.) Plaintiff alleges she told Ms. Atkins the next day that, for personal reasons, she could not accept the offer. (Dkt. No. 1 at 6 of 12.) Although Plaintiff suggested two other individuals for this position, Plaintiff alleges "this job never got posted for anyone to apply." (Dkt. No. 1 at 6 of 12.) Plaintiff further alleges, *inter alia*,

> Shortly after this, going to work was extremely hard. I wanted to quit so many times. Arnetta Adkins created a very hostile work environment. She was not the kindest

3

person to work with. She made the environment stressful for everyone. She made the environment very hostile for me. I hated going in that office. She told the team that I was dumb and that I didn't know anything continuously. She told us that our production was going to include the amount of money each employee brought in as payment. She kept giving me projects that would generate a low revenue, or zero revenue. She kept taking me to her office expressing how I need to bring more money in or I was going to lose my job and that it wouldn't be her fault. Yet, she kept giving me projects to write off old claims that would not generate any money. Although I filed my complaint a couple of years ago or so, I knew she was my punishment for filing a complaint with the EEOC. She was black and age 50 and once again very, very hostile to me.

(Dkt. No. 1 at 6-7 of 12.) Plaintiff alleges she began seeing a therapist approximately two months later, when she realized she was "having a very difficult time coping with the environment created by Ms. Atkins and still dealing with [her] feelings knowing the coders haven't been contacting [her] for any help anymore after they saw that [she] was black." (Dkt. No. 1 at 7 of 12.)

Plaintiff alleges she had a meeting scheduled with her director Mr. Becker on or about May 16, 2013, but she never made it to that meeting because the closer she got to work, the more she began to cry, and she began feeling shortness of breath, chest pain, and dizziness. (Dkt. No. 1 at 7 of 12.) Plaintiff alleges she went to her doctor's office, and the doctor "immediately placed [her] on sick leave, started medication and referred [her] to the MUSC Institute of Psychiatry." (Dkt. No. 1 at 7-8 of 12.) According to Plaintiff, her psychiatrist "kept [her] on sick leave with (FMLA) in attempt to stabilize and get [her] on the right medication as well as psychotherapy." (Dkt. No. 1 at 8 of 12.)

Plaintiff alleges that on or about July 25, 2013, Ms. Gooding mailed Plaintiff a letter "stating that [her] FMLA [would] expire on August 8th, 2013, and that [Plaintiff] needed to return to work on or before the expiration of [her] leave unless medically unable to do so." (Dkt. No. 1 at 8 of 24.) Plaintiff further alleges that on August 8, 2013, she received a letter from Ms. Gooding stating that Plaintiff exhausted her leave on August 7 and that termination was effective August 8. (Dkt. No. 1 at 9 of 12.) Plaintiff also alleges that on August 8, 2013, she obtained a Physician's Statement from

4

Dr. Potter indicating that she was "unable to perform [her] current duties at [her] current place of employment." (Dkt. No. 1 at 9 of 12.) According to Plaintiff, the letter noted that it was "difficult to determine when or if [her] symptoms will improve" and "disclosed [Plaintiff's] conditions of PTSD, Generalized Anxiety Disorder, and panic disorder. . . ." (Dkt. No. 1 at 9 of 12.) Plaintiff contends she was "denied a reasonable accommodation and terminated on August 8, 2013." (Dkt. No. 1-1 at 1 of 12.) Plaintiff also alleges she was discriminated against because of her disability. (Dkt. No. 1-1 at 1 of 12.)

In the "Relief" section of her Complaint, Plaintiff states that she "would like to be awarded for all of [her] pain, mental anguish and [s]uffering endured through this entire issue." (Dkt. No. 1 at 11 of 12; *see also* Dkt. No. 32 at 5 of 5.) Plaintiff further states that she would like Defendant "fine[d] for not adhering to [its] policies and EEOC guidelines for fair treatment." (Dkt. No. 32 at 5 of 5.)

## **APPLICABLE LAW**

### **Summary Judgment Motion Standard**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

## DISCUSSION

As noted above, both parties have moved for summary judgment. (Dkt. No. 79; Dkt. No. 81.) This employment dispute involves several claims: (a) claims for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), (b) a claim for age discrimination in violation of the Age Discrimination in Employment Act, as amended ("ADEA"), (c) a claim for disability discrimination in violation of the Americans with Disabilities Act, as amended ("ADA"), and (d) a claim for interference in violation of the rights provided by the Family and Medical Leave Act, as amended ("FMLA"). (*See* Dkt. No. 1; Dkt. No. 1-1; Dkt. No. 32; Dkt. No. 32-1; Dkt. No. 36.) Both parties assert that they are entitled to summary judgment on each claim. (*See* Dkt. No. 79; Dkt. No. 81-1.) The undersigned addresses Plaintiff's claims in turn.

### 1.    Race and Age Discrimination

Plaintiff, an African-American over age 40, alleges that Defendant discriminated against her on the basis of race and age when it failed to hire her for the position of Coder I; Ms. Griffin, a white employee, was hired for the position. (Dkt. No. 32 at 3-4 of 5.) Defendant hired Plaintiff in 2007 for the position of insurance collector; in September of 2008, Plaintiff became division leader. (Pl. Dep. at 46-47.) In August of 2011, Plaintiff applied for the position of Coder I. (Pl. Dep. at 75-76.) Three applicants were selected for a peer review and interviewed by three coders. (Pl. Dep. at 94; Shattuck Decl. ¶ 4.) The three individuals who participated in Plaintiff's peer review were Shawn Whitney, Sherry Blackwell, and Elizabeth Burton. (Pl. Dep. at 94.) Plaintiff testified that although she did not know Elizabeth Burton prior to the peer review, she "knew who Sherry was and . . . knew who Shawn was." (Pl. Dep. at 94.) She also testified that Ms. Whitney and Ms. Blackwell "knew [Plaintiff] as well." (Pl. Dep. at 95-96.) When asked what was discussed in the peer review, Plaintiff stated,

> [Shawn, Sherry, and Elizabeth] started telling me . . . about the coding and how they sometimes wear scrubs and how they have to go to the OR sometimes and code them. That was fine with me because I worked as a medical assistant. I wore scrubs for

6

years. So they told me how I would have to speak with the doctors and the nurses and such. And I told them, that's not a problem. I have done that for years. Told me I needed to be fluent with my terminology. That's not a problem. I have done that for years. Asked me if I knew how to mark notes. Yes. I know how to mark notes. I do that upstairs. And I remember Shawn saying, oh, you already know how to do that. And, you know, basically after that she said, well, we just wanted to see you. And I just felt like she was so disappointed. You know, it just felt like she was disappointed. You know, it went from me feeling good to when she said that, it felt like she was disappointed and she goes, we just wanted to see.

(Pl. Dep. at 106-07.) Plaintiff was not selected for the Coder I position; instead, it was offered to and accepted by Ms. Griffin, who was 32 and white. (Pl. Dep. at 114-15.)

To prevail on her claim of race discrimination, Plaintiff must prove that she was "treated less favorably" because of her race; to prevail on her claim of age discrimination, Plaintiff must prove that she was "treated less favorably" because of her age. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005) (citations omitted). "[T]o establish a prima facie case of racial discrimination [or age discrimination] in promotions . . . , [Plaintiff] must follow the burden-shifting framework outlined by the Supreme Court in *McDonnell Douglas*. . . ." *Anderson*, 406 F.3d at 268 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429-31 (4th Cir. 2000).[2] Pursuant to this framework, Plaintiff can establish a *prima facie* case by showing the following: "(1) she is a member of a protected group, (2) she applied for the position in question, (3) she was qualified for that position, and (4) the defendants rejected her application under circumstances that give rise to an inference of unlawful discrimination." *Anderson*, 406 F.3d at 268 (citations omitted). Once Plaintiff establishes a *prima facie* case, "the burden then shifts 'to the employer to articulate some legitimate, nondiscriminatory reason' for the decision not to promote." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). "After the employer states a reason for its decision, [the plaintiff] has the opportunity to

---

[2] The undersigned discerns no direct evidence of discrimination or retaliation.

show that the stated reason is a pretext for discrimination. . . ." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

Defendant is entitled to summary judgment on Plaintiff's claims of age and race discrimination. Even assuming Plaintiff presents evidence of a prima facie case–a burden which is "not onerous"–Defendant offers evidence herein of a legitimate, nondiscriminatory reason for failing to offer the position of Coder I to Plaintiff. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (citations omitted). Defendant presented the Declaration of Leanne Shattuck, who was at the time one of the hiring managers for the Coder I position at issue in the case *sub judice*. (*See* Shattuck Decl. ¶ 2.) Shattuck stated that part of the hiring process for the Coder I position "involved a peer review interview in which candidates were interviewed by a panel of three experienced coders . . . with whom the successful candidate would regularly work." (Shattuck Decl. ¶ 3.) Shattuck further stated as follows:

> 4. At the conclusion of the peer review interviews, the interviewers submitted a written report of their interviews in which they recorded their observations of the candidates and ranked the candidates. A true and accurate copy of the interviewers' written report is attached hereto [as] Exhibit 1. The peer committee interviewed Plaintiff, Kim Griffin, and Phyllis Brookshear. The interviewers unanimously ranked Kim Griffin first in each of the four categories that they evaluated: Interview Ability; Fit within the Team; Fit within the Department/Specialty; and Current Work Relationship. Plaintiff was not ranked higher than Ms. Griffin in any category.
>
> 5. The interviewers also noted that Ms. Griffin was the most professional and confident during the interview and conducted herself in a polished manner. The interviewers noted that Ms. Griffin was the most prepared of the three candidates for the interview and asked well thought-out questions related to the position. Finally, the interviewers noted that Ms. Griffin was recognized for her participation and performance in coding classes, and it was mentioned that she was always most prepared and asked great questions.
>
> 6. As a result of the interviewers' recommendations that Ms. Griffin was the best candidate for the position, I interviewed Ms. Griffin on September 28, 2011. My interview with Ms. Griffin was exceptional, and I concluded that she should be offered the Coder I position. Ms. Griffin accepted this offer.
>
> 7. Ms. Griffin was hired to the Coder I position solely because she was the best candidate for the position based on her skills, experience, and interviews. Ms. Griffin

met all of the prerequisites for the position and was equally or more qualified for the position as compared to Plaintiff. Neither Plaintiff's race nor her age was a factor in the hiring process or the decision to hire Ms. Griffin instead of Plaintiff.

(Shattuck Decl. ¶¶ 4-7.)

Given that Defendant articulated a legitimate, nondiscriminatory reason for the decision to hire Ms. Griffin instead of Plaintiff, Plaintiff "has the opportunity to show that the stated reason is a pretext for discrimination." *Anderson*, 406 F.3d at 268 (citing *McDonnell Douglas*, 411 U.S. at 804). Plaintiff asserts that Defendant's stated reasons were a pretext for discrimination because Griffin was less qualified than Plaintiff. (*See, e.g.* Pl. Dep. at 115.)  When asked to describe how Ms. Griffin was less qualified than Plaintiff, Plaintiff indicated that Ms. Griffin had "just obtained" her professional coding certification. (Pl. Dep. at 115.) Plaintiff asserts that Griffin "was only certified for about 2 weeks prior to receiving the job offer." (Dkt. No. 32 at 4 of 5.) Plaintiff also remembered Ms. Griffin sent "some stupid answers" on the "request log," such as when Ms. Griffin "coded a 12-year old child as having senile cataracts." (Pl. Dep. at 115.) Plaintiff further asserts that she "knew [she] had more experience than Ms. Griffin," as Ms. Griffin "was under [Plaintiff's] leadership on [Plaintiff's] team." (Dkt. No. 87 at 22 of 28.)

The undersigned concludes this evidence does not present a genuine issue of material fact concerning whether Defendant's stated reasons for selecting Ms. Griffin were a pretext. Plaintiff admitted during her deposition that being certified was not a requirement of the position but stated, *inter alia*, "No, it was not required but, once again, coding, front line. You should want your best. In the front getting the money. You want the pilot driving the plane. You don't want the stewardess driving the plane." (Pl. Dep. at 116; *see also* Pl. Dep. at 43.) Although certification was not a requirement of the Coder I position, all three individuals interviewed were certified. (*See* Shattuck Decl. Ex. 1.) The fact that Plaintiff obtained her certification before Ms. Griffin obtained hers does not establish pretext. *See Anderson*, 406 F.3d at 271 (rejecting the plaintiff's claim "that she established pretext because she has a stronger educational background than Mrs. Pearson," stating,

*inter alia*, "While [the plaintiff] has a stronger educational background than Mrs. Pearson, education is listed as a minimum requirement for the position and is not a deciding factor in determining who receives the promotion. . . . [Plaintiff] may not choose the criteria on which she wishes to compete with Mrs. Pearson for the promotion. Moreover, she cannot establish pretext by relying on criteria of her choosing when the employer based its decision on other grounds." (citations omitted)).

Plaintiff also asserts that the "peer review process is a pretext for unlawful discrimination." (Dkt. No. 87 at 23 of 28.) Plaintiff points to where Defendant asserts that the "use of a peer review interview as part of the hiring process is a standard practice" and to where Defendant asserts that it "has no such policies and has never maintained any policies specific to peer reviews." (Dkt. No. 87 at 23 of 28.) Plaintiff contends that Defendant used "discriminatory tactics (**Peer reviews**) to screen out minorities." (Dkt. No. 87 at 24 of 28 (emphasis in original).) Plaintiff states, "The defendant's motive of subjecting applicants to a peer review interview or a peer review is pretext for discrimination because there is **no policy validating this practice**." (Dkt. No. 87 at 26 of 28 (emphasis in original).) Plaintiff asserts that Defendant's "responses to their interrogatories give rise to inferences of unlawful discriminatory practices to include **<u>violating their own organizational hiring policies</u>**." (Dkt. No. 87 at 21 of 28 (emphasis in original).) Contrary to Plaintiff's assertions, however, the fact that Defendant did not follow its own policy is not evidence of discrimination or pretext. *See Vaughan v. Metrahealth Co.*, 145 F.3d 197, 203 (4th Cir. 1998), *overruled on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent . . . . Federal courts cannot ensure that business decisions are always informed or even methodical.") (citation and internal quotation omitted); *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 795 (8th Cir. 2011) ("An employer 'can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully

10

discriminate in doing so.'" (quoting *Haas v. Kelly Servs., Inc*., 409 F.3d 1030, 1036 (8th Cir. 2005),

abrogated on other grounds by *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011))).

Plaintiff makes much of the fact that one of her interviewers–Shawn Whitney–told Plaintiff

during the peer review that they "just wanted to see" Plaintiff. (Pl. Dep. at 106-07.) The following

exchange occurred during Plaintiff's deposition:

> Q. And what did you discuss with Shawn, Sherry, and Elizabeth in your–as best as
> you can remember? I know it is a while back.
>
> A. They started telling me . . . about the coding and how they sometimes wear scrubs
> and how they have to go to the OR sometimes and code them. That was fine with me
> because I worked as a medical assistant. I wore scrubs for years. So they told me how
> I would have to speak with the doctors and the nurses and such. And I told them,
> that's not a problem. I have done that for years. Told me I needed to be fluent with
> my terminology. That's not a problem. I have done that for years. Asked me if I knew
> how to mark notes. Yes. I know how to mark notes. I do that upstairs. And I
> remember Shawn saying, oh, you already know how to do that. And, you know,
> basically after that she said, well, we just wanted to see you. And I just felt like she
> was so disappointed. You know, it just felt like she was disappointed. You know, it
> went from me feeling good to when she said that, it felt like she was disappointed and
> she goes, we just wanted to see.
>
> Q. Why do you believe that she was disappointed by–she said they just wanted to see
> you?
>
> A. That's what she said.
>
> Q. So why do you believe she was disappointed?
>
> A. When she asked me if I already knew how to mark notes, she goes, well, do you
> know how to mark notes? And I said, yeah. I do that upstairs for our appeals. And she
> goes, well, I'll never forget it. And she goes, oh, so you already know how to do that.
> And I said yes. And she goes, oh well, you know, they looked at each other and said,
> well, we just wanted to see you, and that's when I felt bad. I just felt funny. I felt
> weird. It just didn't feel right.
>
> Q. And why is that?
>
> A. Because it felt like after that last thing that she was disappointed.
>
> Q. And what about we just wanted to see you made you believe she was
> disappointed?

A. After the last question she was like, oh, well, you already know how to do that, and she spoke softly. . . . She spoke very softly. She had a very soft voice. She said, oh, you already know how to do that. So you already know how to do that, and I said yes.

Q. What's negative about already knowing how to do it?

A. I don't know. You'd have to ask her.

Q. Is there anything else you can tell me–let me ask you this. Is it just your belief, your opinion that she was disappointed in some way?

A. That's how it felt.

Q. But you have no other evidence to support your opinion?

A. Nope. That's how it felt. I felt she was disappointed. And immediately following that, she just wanted to see me or we just wanted to see you, and that's when I–I felt worse. And it was very nice to meet you. Elizabeth was very professional. She was like, Kisha thank you so much for giving us your time. She was very professional. She was the one who escorted me out and, as I was, she walked with me to the door and held the door open for me. And as I was leaving that's when I heard somebody say, is that her. I didn't look back. I just kept going.

(Pl. Dep. at 106-09.) Plaintiff does not know who said "is that her." (Pl. Dep. at 109.)

When asked if anything was said to Plaintiff that Plaintiff "believed was racially insensitive or derogatory or discriminatory," Plaintiff replied, "Questionably when she just wanted to see me, so I guess my answer is yes. Just wanting to see me made me feel weird." (Pl. Dep. at 110.)[3] When asked whether Plaintiff had "any evidence" that her "race played a factor in the decision not to offer [her] a position," Plaintiff stated, "Yes. They hired Kim. Kim was 32 and she was white." (Pl. Dep. at 114.)[4] The undersigned concludes that Plaintiff has not presented evidence sufficient to withstand

---

[3]Plaintiff testified that these three individuals "recognized [Plaintiff], but they didn't know who [she] was." (Pl. Dep. at 165.)

[4]The following exchange also occurred during Plaintiff's deposition:
Q. Did anybody in HR ever make any comments to you that were related to your race or age?
A. No.
Q. Has anybody at U.M.A. ever made a comment to you that you believe was tied to your race or age, other than the allegation that you've made about wanting to see you?
A. That's the undetectable detection part.
(Pl. Dep. at 144.)

Defendant's Motion for Summary Judgment.[5] Defendant articulated a legitimate, nondiscriminatory reason for not hiring Plaintiff, and Plaintiff has not presented any evidence that this stated reason was a pretext for discrimination. Plaintiff's claims for age and race discrimination therefore fail. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) ("[The plaintiff's] unsubstantiated allegations and bald assertions concerning her own qualifications and the shortcomings of her co-workers fail to disprove [the defendant's] explanation or show discrimination."); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989) ("[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action."). Accordingly, as to Plaintiff's claims for age and race discrimination, Plaintiff's Motion for Summary Judgment (Dkt. No. 79) is denied, and Defendant's Motion for Summary Judgment (Dkt. No. 81) is granted.

## 2.    **Retaliation**

Plaintiff alleged in her Complaint that in January or February of 2013, Defendant "hired a 50 year old, black lady (Arnetta Atkins)" as Plaintiff's "punishment for filing a complaint with the EEOC." (Dkt. No. 1 at 6-7 of 12.) Plaintiff alleges that on February 26, 2013, Ms. Atkins asked Plaintiff if she was interested in a position that Atkins "was trying to create as coding supervisor, but not a coding supervisor," where Plaintiff "would remain a division leader and . . . there [would] be

---

[5]The undersigned notes that Plaintiff submitted the statement of Sha'ron Davis, a black female, along with her Motion for Summary Judgment. (Dkt. No. 79-1 at 37 of 103.) Sha'ron Davis details her application for the position of Coder I in the radiology department. (Dkt. No. 79-1 at 37 of 103.) Sha'ron Davis indicates she had an interview with the department manager and a few days later had a "second interview with the peers." (Dkt. No. 79-1 at 37 of 103.) Sha'ron Davis states that she "found out [by] word of mouth that another employee that was hired after [Sha'ron] was selected for the position." (Dkt. No. 79-1 at 37 of 103.) Sha'ron Davis states that she applied for the Coder I position in the surgical department–the same position at issue in the case *sub judice*–in August of 2011 but never received any calls or requests for interviews. (Dkt. No. 79-1 at 37 of 103.) Sha'ron states that she "once again by word of mouth . . . found out that another employee that had just completed the coding certification program and obtained her CPC after the job was posted was selected for the position." (Dkt. No. 79-1 at 37 of 103.) Sha'ron states that "[b]oth young ladies that received the job offer were white employees, both employed after [her]." (Dkt. No. 79-1 at 37 of 103.) Sha'ron Davis' statement does not create a genuine issue of material fact; it does not show that the Defendant's stated legitimate and nondiscriminatory reasons for selecting Ms. Griffin for the position of Coder I were a pretext for discrimination.

more responsibility, but no additional money." (Dkt. No. 1 at 6 of 12.) Plaintiff alleges she told Ms.

Atkins the next day that, for personal reasons, she could not accept the offer. (Dkt. No. 1 at 6 of 12.)

Although Plaintiff suggested two other individuals for this position, Plaintiff alleges "this job never

got posted for anyone to apply." (Dkt. No. 1 at 6 of 12.) Plaintiff further alleges, *inter alia*,

> Shortly after this, going to work was extremely hard. I wanted to quit so many times.
> Arnetta Adkins created a very hostile work environment. She was not the kindest
> person to work with. She made the environment stressful for everyone. She made the
> environment very hostile for me. I hated going in that office. She told the team that
> I was dumb and that I didn't know anything continuously. She told us that our
> production was going to include the amount of money each employee brought in as
> payment. She kept giving me projects that would generate a low revenue, or zero
> revenue. She kept taking me to her office expressing how I need to bring more money
> in or I was going to lose my job and that it wouldn't be her fault. Yet, she kept giving
> me projects to write off old claims that would not generate any money. Although I
> filed my complaint a couple of years ago or so, I knew she was my punishment for
> filing a complaint with the EEOC. She was black and age 50 and once again very,
> very hostile to me.

(Dkt. No. 1 at 6-7 of 12.) Plaintiff alleges she began seeing a therapist approximately two months

later, when she realized she was "having a very difficult time coping with the environment created

by Ms. Atkins and still dealing with [her] feelings knowing the coders haven't been contacting [her]

for any help anymore after they saw that [she] was black." (Dkt. No. 1 at 7 of 12.)

Title VII's "antiretaliation provision . . . prohibits an employer from 'discriminat[ing] against'

an employee or job applicant because that individual 'opposed any practice' made unlawful by Title

VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation."

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e-3(a)).

As stated in *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015),

> To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff
> must prove (1) that she engaged in a protected activity, as well as (2) that her
> employer took an adverse employment action against her, and (3) that there was a
> causal link between the two events. A prima facie retaliation claim under 42 U.S.C.
> § 1981 has the same elements.

*Boyer-Liberto*, 786 F.3d at 281 (internal quotation marks and citations omitted).

14

Defendant contends it is entitled to summary judgment on Plaintiff's retaliation claim because (a) Plaintiff "suffered no adverse employment action," and (b) "there is no causal connection between her protected activity and any adverse action she suffered." (Dkt. No. 81-1 at 18-19.) The following exchange occurred during Plaintiff's deposition:

Q. That's fine. You say in your complaint actually that she made the environment stressful for everyone. I'm quoting now from page six of twelve; correct?

A. She did. That's correct.

Q. Do you have any knowledge that she was aware of the fact that you had filed a discrimination charge more than a year earlier?

A. I don't know. I know Falesha Davis shared it with management, but as far as Arnetta, I don't know, but the way she started treating me and singling out, then I started believing she had known. There is still an active E.E.O.C. investigation or the E.E.O.C. case was still open.

Q. I thought you said that her attitude towards you changed after you turned down the promotion she offered you?

A. I did say that. That's exactly what I said.

Q. You believe it was tied to that?

A. Yes.

(Pl. Dep. at 172-73; see also Pl. Dep. at 175.) The Plaintiff further deposed as follows:

Q. Now, you don't believe Arnetta [Atkins] was hired to harass you?

A. Initially I didn't, but now that she's no longer there, yes, I do.

Q. You believe M.U.S.C. or U.M.A. hired her for the sole purpose of harassing you?

A. She was black. She's over 50. Her words. She's no longer there now. She took me aside and treated me the way nobody should be treated at work. Nobody should be treated that way, period. She treated me that way at work behind closed doors.

Q. But you have no knowledge that M.U.S.C. went and hired her in order to–and told her to do that, do you?

A. Towards the end I started feeling that way especially after I learned that she was no longer employed there.

Q. You don't have any evidence to support that, do you?

A. No. Just besides the fact that she just got there and she knew to come to me with a proposed position that hadn't been posted, no one else knew about it. And then after I declined politely, she just started–everything went from decent to horrible. It just changed.

Q. After that?

A. After that. It just changed and that's why I started feeling that way.

Q. And you said, to your knowledge, she held everybody else to the same standards that she was–that you've alleged you were being held to?

A. Not the same. She was harder on me.

Q. But you don't–you have no knowledge of any conversation she had with other people, do you?

A. No, not like–not the way she spoke to me.

Q. Well, you don't have any knowledge of any conversations she had with people in private, do you?

A. In private, no. But I know she had them with me, and I sat right there.

(Pl. Dep. at 199-201.)

When asked to describe how Ms. Atkins discriminated or retaliated against Plaintiff, Plaintiff testified as follows at her deposition:

> She took me, she always took me, often took me away from everybody else and would just tear me down. She would give me stupid, little projects that would basically waste time, you know, just–she would tear me down verbally. She would criticize my work. She would give me stupid, little projects, but before that, she wanted me to sit with her and show her how to work the system, and we had a training department for that. If she needed to go back through training, she could go back through training, but she wanted to waste my time. She had me sitting with the team for Excel or Microsoft training. Well, we had classes for those. She did a lot of, you know, little things like that, and then would call me in her office and ask me what I'm doing and make it seem like I'm not doing my job, but not reference or forget that she gave me this little off-the-wall projects to do.

(Pl. Dep. at 166-67.) "Everybody on the Medicare and Medicaid, the government team," was placed under Ms. Atkins. (Pl. Dep. at 283.)

16

"Retaliatory harassment can constitute adverse employment action, but only if such harassment affects the terms, conditions, or benefits of [the plaintiff's] employment." *Von Gunten v. Maryland*, 243 F.3d 858, 869-70 (4th Cir. 2001), *overruled on other grounds by Burlington*, 548 U.S. 53 (internal quotation marks and citations omitted). Here, however, much like the actions at issue in *Von Gunten*, while there is "no doubt that [Atkins'] actions upset [Plaintiff] to a degree that she subjectively perceived her work environment . . . to be hostile," "there is no evidence that [Atkins' actions] created an environment that a reasonable person would find hostile or abusive." *Id.* at 870 (internal quotation marks and citations omitted). Atkins "made the environment stressful for everyone," and Plaintiff was held to the same production standards as everyone else. (Pl. Dep. at 172-73, 285.) The "imposition of generally applicable departmental policies" does not constitute retaliatory harassment. *Id.* Furthermore, "[i]ncreased tension or unpleasant personal relationships . . . do not rise to the level of actionable retaliatory adverse action." *Chika v. Planning Research Corp.*, 179 F. Supp. 2d 575, 587 (D. Md. 2002) (citing *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857-58 (10th Cir. 2000)). In addition, there is no evidence that Atkins knew that Plaintiff filed a claim for discrimination;[6] this lack of evidence is the "nail in the coffin of [Plaintiff's] *prima facie* case." *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) (no error in granting summary judgment to employer where a discriminatory retaliation plaintiff failed to provide evidence that the firing supervisor even knew the plaintiff had filed a claim for discrimination). Defendant is entitled to summary judgment on Plaintiff's claim that Defendant retaliated against her by hiring "a 50 year old, black lady (Arnetta Atkins)" as Plaintiff's "punishment for filing a complaint with the EEOC." (Dkt. No. 1 at 6-7 of 12.)

---

[6]Plaintiff testified at her deposition that she was uncertain whether Ms. Atkins had knowledge of Plaintiff's prior discrimination charge, but Plaintiff did "know it was disclosed to the other managers." (Pl. Dep. at 283-84.) Plaintiff testified that Ms. Atkins never mentioned that Plaintiff had filed an EEOC charge; according to Plaintiff, however, Atkins "had no other reason to treat [Plaintiff] worse than everybody else." (Pl. Dep. at 284-85.)

In her Response in Opposition, Plaintiff appears to change course, now asserting additional instances of retaliation: (a) that she was fired from her job because she filed a complaint with the EEOC (Dkt. No. 87 at 15-16 of 28), and (b) she was "involuntarily discharged [her] as a patient of the MUSC Institute of Psychiatry . . . on October 7th 2014," while Plaintiff still "requir[ed] Psychiatric care" because she filed "a complaint in Federal court for Retaliation, Disability discrimination and FMLA violations on August 6th 2014." (Dkt. No. 87 at 17 of 28.) Plaintiff also asserts that the adverse employment action she suffered was that the Defendant "changed [her] FMLA exhaust date from August 8th 2013 to August 7th 2013 to avoid any legal obligations as dictated" by the ADA and "MUSC-P policy # HR22-FMLA." (Dkt. No. 87 at 16 of 28.) None of these claims were raised in Plaintiff's Complaint, and "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (cited in *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008)); *see also Dorsey v. Aetna Life Ins. Co.*, Civ. A. No. 2:12cv90, 2013 WL 1288165, at *23 (E.D. Va. Mar. 26, 2013) ("To allow the plaintiff to effect a constructive amendment of the complaint on summary judgment, well after the close of discovery, would seriously undermine the fairness of the litigation and unfairly prejudice [the defendant]." (internal quotation marks omitted)).[7] Defendant's Motion for Summary Judgment (Dkt. No. 81) is therefore

---

[7]To the extent Plaintiff's filings can be interpreted as a request to amend, that request is denied. When a party seeks to amend his or her pleadings after the deadlines in the scheduling order have passed, the "moving party must first satisfy the good cause standard of Rule 16(b); if the moving party satisfies Rule 16(b), the movant must then pass the tests for amendment under Rule 15(a)." *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F.Supp.2d 618, 631 (D. Md. 2003); *see also Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008) ("[A]fter the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings."). In an unpublished opinion, the Fourth Circuit stated, "Rule 16(b)'s good cause standard focuses on the timeliness of the amendment and the reasons for its tardy submission; the primary consideration is the diligence of the moving party." *Montgomery v. Anne Arundel County, Md.*, 182 F. App'x 156, 162 (4th Cir. 2006) (citing *Odyssey Travel*, 262 F.Supp. at 631-32).

Pursuant to the last scheduling order entered in this case, motions to amend the pleadings were due by December 4, 2014, and discovery ended on March 4, 2015. (*See* Dkt. No. 38.) Plaintiff attempts to raise these new claims many months after the deadline to amend and a few months after discovery ended. The request to amend is untimely by several months, and Plaintiff has not provided any reasons for her tardy submission of these claims. Plaintiff therefore does not meet the "good cause" standard set forth in Rule 16(b).

granted as to Plaintiff's retaliation claim, and Plaintiff's Motion for Summary Judgment (Dkt. No. 79) is denied.

### 3.    Disability Discrimination

Title 42, United States Code, Section 12112 provides, *inter alia,* "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." As noted in *Martinson v. Kinney Shoe Corporation,* 104 F.3d 683 (4th Cir. 1997),

> [T]o establish a prima facie case of discriminatory firing, a plaintiff must prove: (1) he has a "disability;" (2) he is a "qualified individual;" and (3) in "discharg[ing]" him, his employer "discriminate[d] against [him] because of [his] disability."

*Martinson,* 104 F.3d at 686 (quoting 42 U.S.C. § 12112(a); *citing Doe v. Univ. of Md. Med. Sys. Corp..* 50 F.3d 1261, 1264-65 (4th Cir. 1995)). Once a plaintiff states a *prima facie* case, "the burden shifts to the employer to offer evidence that the plaintiff was [fired] for a legitimate, non-discriminatory reason." *Equal Emp't Opportunity Comm'n v. Town & Country Toyota, Inc.,* 7 F. App'x 226, 232 (4th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000)).

Plaintiff asserts that, in firing her, Defendant discriminated against her because of her disability. Plaintiff asserts she has the following disabilities: post traumatic stress disorder (PTSD), panic disorder, generalized anxiety disorder, and major depressive disorder. (Dkt. No. 79 at 6-7 of 11.) Plaintiff asserts she was qualified for her job and "was fired because of [her] disability." (Dkt. No. 79 at 7 of 11.) Plaintiff contends she "reported this to [her] supervisor, manager, and department head via email," and "[s]oon after, [she] was summoned to a secluded training room by [her] manager where [she] was verbally intimidated and harassed." (Dkt. No. 79 at 7 of 11.)

As noted above, however, to establish a *prima facie* case of discriminatory firing, Plaintiff must establish that she is a "qualified individual." *Martinson,* 104 F.3d at 686. A "qualified

individual" is defined as follows: "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also Martinson*, 104 F.3d at 686-87 ("To satisfy the second prong of the prima facie test, an ADA plaintiff must demonstrate that 'with or without reasonable accommodation, [he] can perform the essential functions of the employment position.'" (quoting § 12111(8))). Defendant is entitled to summary judgment on the instant claim, as there is no genuine issue of material fact concerning whether Plaintiff was a "qualified individual"—the undisputed evidence reveals that she was not.

Plaintiff's leave pursuant to the FMLA began on May 16, 2013. (Wiles Decl. ¶ 4.) As of July 3, 2013, Dr. Roten stated that Plaintiff was unable to perform any essential functions of her employment. (*See* Def.'s Mot. for Summ. J. Ex. H.) Plaintiff testified at her deposition that her doctor had not released her to return to work as of July 25, nor had he released her to return to work as of August 8. (Pl. Dep. at 211.) In fact, no physician released Plaintiff to return to work–in any capacity–after August 8, 2013. (Pl. Dep. at 213.) Furthermore, "since August the 8th, [Plaintiff] ha[s] represented to short-term and long-term disability providers that [she is] unable to work in any capacity." (Pl. Dep. at 214.)

The undisputed evidence contained in this record reveals that–at the relevant time–Plaintiff was not able to work in any capacity. As the Fourth Circuit noted in *Lamb v. Qualex, Inc.*, 33 F. App'x 49 (4th Cir. 2002),

> A regular and reliable level of attendance is an essential function of one's job. Indeed, an employee who does not come to work cannot perform any of his job functions, essential or otherwise. An employee who cannot meet the attendance requirements of the job at issue cannot be considered a "qualified" individual protected by the ADA.

*Lamb*, 33 F. App'x at 56-57 (internal quotation marks and citations omitted). Given that the undisputed evidence reveals Plaintiff was unable to work in any capacity, Plaintiff is not a "qualified individual." Accordingly, as to Plaintiff's claim for disability discrimination, Defendant's Motion

for Summary Judgment (Dkt. No. 81) is granted, and Plaintiff's Motion for Summary Judgment (Dkt. No. 79) is denied. *See Lamb*, 33 F. App'x at 50-51 ("The primary question in this case is whether the appellee violated the ADA by discharging Lamb, a disabled employee, who requested that he be allowed to work on a part-time basis. Because Lamb was unable to perform the essential functions of his job, we hold that he was not a 'qualified individual with a disability' protected by the ADA."); *see also Tyndall v. Nat'l Educ. Ctrs., Inc. of Ca.*, 31 F.3d 209, 213 (4th Cir. 1994) ("Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform any of his job functions, essential or otherwise." (internal quotation marks and citations omitted)).

Plaintiff complains in her Response in Opposition that "[n]o options or reasonable accommodations were presented." (Dkt. No. 87 at 5 of 28.) Plaintiff testified that she was "denied a reasonable accommodation and terminated on August 8, 2013." (Pl. Dep. at 164.) Plaintiff asserts that she did request an accommodation, asking "What options do I have? Please tell me what to do," and "What can I do? Please help me." (Dkt. No. 87 at 13 of 28.) Plaintiff asks, *inter alia*, "Is it legal for an employer to decide which disabilities to reasonably accommodate and which not to accommodate when the employee is documented as having mental disabilities? Is it legal for an employer to NOT make ANY reasonable accommodations for an employee with mental disabilities? Is it ever legal for an employer to assume or label an employee as totally disabled if a physician hasn't made a definitive decision?" (Dkt. No. 87 a 11-12 of 28.) Assuming that Defendant "fail[ed] to engage in the interactive process" with Plaintiff "to identify a reasonable accommodation," Plaintiff's claim still fails because Defendant "will not be held liable if the employee cannot identify a reasonable accommodation that would have been possible." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346-47 (4th Cir. 2013) (citations omitted). The undisputed evidence reveals that Plaintiff was not able to work at all; Plaintiff is therefore unable to show that a reasonable accommodation was possible. *See Wilson*, 717 F.3d at 347-48 (employer "cannot be held liable for a failure to engage in

the interactive process" where the plaintiff "failed to identify a possible reasonable accommodation that could have been discovered in the interactive process and would have allowed him to perform the essential functions of his position"). Accordingly, as to Plaintiff's disability discrimination claim, Defendant's Motion for Summary Judgment (Dkt. No. 81) is granted, and Plaintiff's Motion for Summary Judgment (Dkt. No. 79) is denied.

**4.    Interference with FMLA Rights**

Plaintiff claims that Defendant interfered with her rights pursuant to the FMLA by terminating her when she still had a few hours of leave remaining. (*See* Dkt. No. 1 at 8-9 of 12.) Plaintiff asserts she was originally told that her leave pursuant to the FMLA expired on August 8, 2013, but that her termination letter indicated she exhausted her leave under the FMLA on August 7, 2013. (Dkt. No. 87 at 5 of 28.) Plaintiff contends that Defendant "fired [her] with at least (one day) of FMLA remaining with known disabilities to avoid legal obligations dictated by the Americans Disabilities Act." (Dkt. No. 87 at 7 of 28.)

Pursuant to the FMLA, "covered employees who take a leave of absence for family or medical reasons" are "'entitled to a total of 12 workweeks of leave during any 12–month period' for family- and health-related matters." *Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)). To establish a claim for unlawful interference with an entitlement to FMLA benefits, Plaintiff must prove the following:

(1) she was an eligible employee;

(2) her employer was covered by the statute;

(3) she was entitled to leave under the FMLA;

(4) she gave her employer adequate notice of her intention to take leave; and

(5) the employer denied her FMLA benefits to which she was entitled.

*Greene v. YRC, Inc.*, 987 F. Supp. 2d 644, 649 (D. Md. 2013) (citing *Rodriguez v. Smithfield Packing Co.*, 545 F.Supp. 2d 508, 516 (D. Md. 2008); *see also Sanders v. City of Newport*, 657 F.3d 772 (9th Cir. 2011); *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)).

Plaintiff's claim for interference with her rights pursuant to the FMLA fails because no reasonable jury could conclude that Defendant denied Plaintiff FMLA benefits to which she was entitled. Both parties agree that Plaintiff began using leave pursuant to the FMLA on May 16, 2013. (*See* Dkt. No. 79-1 at 101 of 103; Dkt. No. 81-14 at 5 of 6.) It is also undisputed that Plaintiff was terminated on August 8, 2013. (*See* Dkt. No. 81-14 at 3 of 6; Dkt. No. 79 at 3 of 11.) The dispute centers over when Plaintiff exhausted all of her FMLA benefits.

In her Motion for Summary Judgment, Plaintiff asserts that she "was fired . . . on August 8th 2013, while still on FMLA only using 469 hours of FMLA whereas the Department of Labor approves 480 hours (12 weeks)." (Dkt. No. 79 at 3 of 11.) She contends she was "fired while still on FMLA with 11 hours available." (Dkt. No. 79 at 3 of 11.) In her Response in Opposition to Defendant's Motion for Summary Judgment, Plaintiff asserts she was originally told that her leave pursuant to the FMLA expired on August 8, 2013, but that her termination letter indicated she exhausted her leave under the FMLA on August 7, 2013. (Dkt. No. 87 at 5 of 28.) Plaintiff contends that Defendant "fired [her] with at least (one day) of FMLA remaining with known disabilities to avoid legal obligations dictated by the Americans Disabilities Act." (Dkt. No. 87 at 7 of 28.) Plaintiff asserts that "[t]he 84th and final day of FMLA [was] August 8, 2013." (Dkt. No. 87 at 9 of 28.) Plaintiff attached a "Personal FMLA Tracking Sheet" to her Motion for Summary Judgment. (*See* Dkt. No. 79-1 at 101 of 103.)

Having examined Plaintiff's Personal FMLA Tracking Sheet and comparing it to Defendant's records, Plaintiff exhausted all of her leave pursuant to the FMLA on August 7, 2013, *unless* two particular days do not count towards Plaintiff's FMLA leave: Monday, May 27, 2013 (Memorial Day) and Thursday, July 4, 2013 (Independence Day). (*See* Dkt. No. 79-1 at 101 of 103.) Contrary

to Plaintiff's assertions, however, these two holidays *do* count towards Plaintiff's twelve weeks of leave. Plaintiff was taking leave in week increments; in fact, she had been out of work since May 16, 2013. The Code of Federal Regulations provides, *inter alia*,

> For purposes of determining the amount of leave used by an employee, the fact that a holiday may occur within the week taken as FMLA leave ***has no effect***; ***the week is counted as a week of FMLA leave***. . . .

29 C.F.R. § 825.200(h) (emphasis added); *see also Mellen v. Trs. of Boston Univ.*, 504 F.3d 21, 25 (1st Cir. 2007) ("[I]f an employee's intermittent leave includes a full, holiday-containing week, section 825.200[(h)] provides that the 'amount of leave used' includes the holiday."). Plaintiff received all twelve weeks of leave to which she was entitled; her claim for interference with FMLA rights therefore fails. As such, Plaintiff's Motion for Summary Judgment (Dkt. No. 79) as to this claim is denied and Defendant's Motion for Summary Judgment (Dkt. No. 81) is granted.

## CONCLUSION

It is therefore ORDERED, for the foregoing reasons, that Plaintiff's Motion for Summary Judgment (Dkt. No. 79) is DENIED. It is further ORDERED that Defendant's Motion for Summary Judgment (Dkt. No. 81) is GRANTED.

IT IS SO ORDERED.

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

March 29, 2016
Charleston, South Carolina

## NOTICE OF RIGHT TO APPEAL

The parties are hereby notified of the right to appeal this Order within thirty days from the date hereof, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.